# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No.: 23-CR-329 (RDM) |
| v. | : | 18 U.S.C. § 111(a)(1) |
| | : | (Assaulting, Resisting, or Impeding |
| **LUKE HOFFMAN,** | : | Certain Officers); and |
| | : | 18 U.S.C. § 111(a)(1) |
| Defendant. | : | (Assaulting, Resisting, or Impeding |
| | : | Certain Officers Using a Dangerous |
| | : | Weapon) |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Luke Hoffman, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote

count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5. At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted

those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8. Prior to January 6, 2021, the defendant, Luke Hoffman, traveled from his home in Kentucky to Washington D.C. to participate in a political rally. On January 6, he wore a black hooded sweatshirt, a black hooded jacket, a coyote-tan tactical vest, and a pair of dark colored gloves with white lines.

9. By approximately 1:25 p.m., Hoffman had positioned himself amid a raucous crowd of rioters on the West Plaza of the U.S. Capitol building. There, Hoffman joined the crowd in confronting the law enforcement officers who were attempting to maintain a defensive perimeter between the rioters and the Capitol.

10. Hoffman, who had moved to the front of that crowd, verbally berated the officers manning the line. When those officers attempted to move a segment of metal fencing between themselves and the crowd, Hoffman reacted aggressively. He lunged forward, grabbed the fence segment, and yanked it away from the officers.

11. About an hour later, at 2:28 p.m., in nearly the same location, the crowd had grown in size and intensity. As rioters began to overrun the group of officers who were still trying to a defend the West Plaza, police lines gave way. In the throes of this chaotic moment, Hoffman attacked Metropolitan Police Officer Ca. W.

12. As Officer Ca. W. stood in line with other officers attempting to keep the rioters at bay, Hoffman sprang out of the crowd, screaming, "What's up! This is our house!" He moved toward Officer Ca. W., who held his baton chest high in a defensive posture. Hoffman grabbed the baton with both hands and tried to pull it away from the officer while continuing to scream. *See* Image 1.



**Image 1.** Hoffman, screaming, attacks a police officer trying to defend the Capitol building.

13. Although Officer Ca. W. retained the baton, the police line was forced back and Hoffman and the rest of the crowd marched forward toward the Capitol building.

14. Minutes later, at approximately 2:30 p.m., with officers now backed into the southern portion of the West Plaza and surrounded by the crowd, Hoffman again joined the mob's attack.

15. Officer Ch. W., who stood at the front of that group of officers, attempted to disperse the crowd by spaying some particularly aggressive rioters with OC spray. In response, Hoffman stepped forward from the crowd toward Officer Ch. W., extended his right arm, and unleashed a burst of OC-based spray at the officer, who ducked to try to avoid it. Hoffman then retreated back into the crowd.

16. The spray Hoffman used was capable of inflicting serious bodily injury or death, and he used it with the intent to commit bodily injury.

17. After attacking Officer Ch. W., Hoffman advanced closer to the Capitol, up to the Lower West Terrace. There, he proceeded all the way to the Lower West Terrace entrance, known as "the Tunnel," where some of the most violent attacks against police officers occurred on January 6.

18. For more than twenty minutes, beginning at approximately 3:43 p.m., Hoffman stood at the threshold of the Tunnel's entrance, surrounded by a mob of violent rioters.

19. While he stood at the mouth of the Tunnel, Hoffman supported other rioters as they attacked the police officers inside. At one point, another rioter, clad in body armor and a helmet, climbed on top of Hoffman and several other rioters. As the armored rioter knelt on Hoffman's shoulders, he used his elevated position to attack the officers inside the Tunnel with a wooden pole. *See* Image 2.



**Image 2.** Hoffman, circled in yellow, supports another rioter as he attacks officers inside the Tunnel.

20. Hoffman also goaded the crowd around him outside the Tunnel, waving his hand overhead, encouraging the crowd to press further. Finally, at approximately 4:05 p.m., Hoffman left the area outside the Tunnel.

*Elements of the Offense*

21. The parties agree that Assaulting, Resisting, or Impeding Officers in violation of 18 U.S.C. § 111(a) requires the following elements:

   a. First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Ca.W., an officer from the Metropolitan Police Department.

   b. Second, the defendant did such acts forcibly.

   c. Third, the defendant did such acts voluntarily and intentionally.

   d. Fourth, Officer Ca.W. was assisting officers of the United States who were then engaged in the performance of their official duties.

e. Fifth, the defendant made physical contact with Officer Ca.W. or acted with the intent to commit another felony. For purposes of this element, "another felony" refers to the offense charged in Count 1 of the Indictment, Civil Disorder in violation of 18 U.S.C. § 231(a)(3).

22. The parties agree that Assaulting, Resisting, or Impeding Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a) requires the following elements:

a. First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Ch.W., an officer from the Metropolitan Police Department.

b. Second, the defendant did such acts forcibly.

c. Third, the defendant did such acts voluntarily and intentionally.

d. Fourth, Officer Ch.W. was assisting officers of the United States who were then engaged in the performance of their official duties.

f. Fifth, the defendant acted with the intent to commit another felony. For purposes of this element, "another felony" refers to the offense charged in Count 1 of the Indictment, Civil Disorder in violation of 18 U.S.C. § 231(a)(3).

### *Defendant's Acknowledgments*

23. The defendant knowingly and voluntarily admits to all the elements as set forth above. He further admits that the spray he used against Officer Ch. W was a "dangerous weapon" as that term is used in U.S.S.G. §§ 1B1.1 and 2A2.2.

24. Specifically, the defendant admits that he forcibly assaulted Officers Ca.W. and Ch.W. while they were assisting officers or employees of the United States Capitol Police, and the defendant knew that the officers were engaged in the performance of official duties. The defendant further admits that he intentionally used a deadly or dangerous weapon—an OC-based spray—when he assaulted Officer Ch.W.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ Eric Boylan
Eric Boylan
Assistant United States Attorney
Texas Bar No. 24105519
Capitol Siege Section
U.S. Attorney's Office
District of Columbia
Telephone No: (202) 815-8608
Email Address: eric.boylan@usdoj.gov

## **DEFENDANT'S ACKNOWLEDGMENT**

I, Luke Hoffman, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: _____  _____
LUKE HOFFMAN
Defendant

## **ATTORNEY'S ACKNOWLEDGMENT**

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: _____  _____
PAULETTE PAGÁN
Attorney for Defendant

## DEFENDANT'S ACKNOWLEDGMENT

I, Luke Hoffman, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 2-12-2024

LUKE HOFFMAN
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 02/09/2024

PAULETTE PAGÁN
Attorney for Defendant