**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:23-CR-00329-RDM** |
| | ) | |
| **LUKE HOFFMAN,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Luke Hoffman ("Mr. Hoffman") comes before this Court humbled and deeply remorseful for his actions on January 6, 2021 ("January 6") and appears for sentencing following his acceptance of responsibility upon entering a plea of guilty to two counts of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).  Mr. Hoffman respectfully submits this Memorandum in Aid of Sentencing.

With a large community of support surrounding him, and a young family fully dependent on his income and fatherhood, he is sure to turn the page on this dark chapter in his life, and all parties would benefit from the page being turned sooner rather than later.  Based upon his personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, the minuscule likelihood of recidivism, and the need to avoid unwarranted sentencing disparities, Mr. Hoffman respectfully requests that the Court impose a term of probation with home detention, as such as sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

1

## I.  MR. HOFFMAN'S BACKGROUND

Mr. Hoffman is a forty-year-old (40) husband to Kari Hoffman, a homemaker, and the father of eight children: Kami (23), Meadow (20), Madden (16), Juliana (11), Leviticus (9), Lazarous (5), Lucy (2), and Judah (2 months). *See* Final Presentence Investigation Report ("PSR") at ¶ 82.  Although the eldest three children are from his wife's previous relationship, Mr. Hoffman treats them as his own. *Id.*  His family resides at their farm property in Dover, Kentucky. *Id.* at ¶ 86.

Mr. Hoffman was born in Kentucky and raised by both parents until they divorced when he was ten (10) years old. *Id.* at ¶ 76.  He never witnessed domestic violence or experienced abuse as a child. *Id.* at ¶ 80.  He is the youngest of three siblings and has a half-brother from his mother's second marriage. *Id.* at ¶ 78.  He has maintained great relationships with his parents and siblings. *Id.* at ¶ 80.  He has always been surrounded by a large extended family, and he experienced a fairly normal childhood. *Id.*  Due to his father's struggles with alcoholism, the divorce, and his mother's need to work multiple jobs to provide for the household, there were times that a young Mr. Hoffman had to take on the role of caretaker for his siblings. *Id.* at ¶ 81.  His mother describes Mr. Hoffman as a "family man" and a "kind, considerate, compassionate human being" that "has always been the one to oversee the care of others." *Id.*

Mr. Hoffman earned his general education diploma (GED) in 2001 in Boulder, Colorado, where he lived for a short time. *Id.* at ¶¶ 86, 95.  In 2010, he completed a few semesters at Northern Kentucky University but left school to focus on obtaining gainful employment. *Id.* at ¶ 96.  Prior to establishing his own business in 2012, he worked in the restaurant industry and accepted

contracting jobs. *Id*. at ¶ 101.  Mr. Hoffman now owns L&M Contracting, a company offering various maintenance services to facilities such as lawn care, building repair, and upkeep. *Id*. at ¶ 100.  He works every weekday all year long, and he works not only in Kentucky but in the surrounding states as well. *Id*.  He is in good overall mental and physical health, has some tattoos, does not consume recreational or illicit drugs, and consumes alcohol only socially and not to excess. *Id*. at ¶¶ 89-94.

Mr. Hoffman's wife, Kari, describes him as "an amazing guy, husband, and father, he would give his shirt off his back for someone else, he helps other people in the community." *Id*. at ¶ 84.  She has witnessed his "major regret" about January 6 and has seen him go from a "happy-go-lucky guy" to being depressed and upset with himself. *Id*.  Mr. Hoffman's close family and friends describe him as a selfless and dedicated father and a productive member of society with a good heart who works hard to take care of his family and raise his children with good morals and values. *See* Exhibits B – II.  He is dedicated to his business, provides for his family, and tries to set his children up to have the best chance at bright futures. *Id*.  Those who know him best describe his actions on January 6 as an aberration and mistake in an otherwise good man's life. *Id*.

## II.    THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 39 (2007), it may not treat that range as mandatory or presumptive, *Id*. at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors . . . make an individualized

assessment based on the facts presented," *Gall*, 552 U.S. at 49-50, and explain how the facts relate to the purpose of sentencing. *Id*. at 53-60; *see also Pepper v. United States*, 562 U.S. 476 (2011). The Court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Pepper*, 562 U.S. at 493 (internal quotations omitted).

To ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory…, as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations")).

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 562 U.S. at 488 (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Forman*, 436 F.3d 638, 644,

4

n.1 (6. Cir. 2006).  Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher."  *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2nd Cir. 2006).

### III.    APPLICABLE U.S. SENTENCING GUIDELINES RANGE

The following United States Sentencing Guidelines ("U.S.S.G.") analysis applies in this case, which is consistent with the analysis found in the PSR at ¶¶ 42-61:

**2023 U.S. Sentencing Guidelines**

Group 1 – Count 3 [Officer Ca. W.]

U.S.S.G. § 2A2.2(a) – Base Offense Level ....................................................................... 14

U.S.S.G. § 3A1.2(b) – Victim Related Adjustment ..........................................................+6

Adjusted Offense Level for Count 3 (Subtotal) ............. 20

Group 2 – Count 4 [Officer Ch. W.]

U.S.S.G. § 2A2.2(a) – Base Offense Level  ......................................................................14

U.S.S.G. § 2A2.2(b)(2)(B) – Specific Offense Characteristics – Dangerous Weapon Used ....... +4

U.S.S.G. § 3A1.2(b) – Victim Related Adjustment ....................................................... +6

Adjusted Offense Level for Count 4 (Subtotal) ............. 24

Greater of the Adjusted Offense Levels for Counts 3 and 4 ............................................................ 24

U.S.S.G. § 3D1.4 – Multiple Count Adjustment ...............................................................+2

Combined Adjusted Offense Level .................... 26

U.S.S.G. § 3E1.1(a) – Acceptance of Responsibility ....................................................-2

U.S.S.G. § 3E1.1(b) – Acceptance of Responsibility ....................................................-1

**Total Offense Level** ...................................................................................................................**23**

Due to a conviction for driving without an operator's license and possession of a small bag of marijuana that occurred over twelve (12) years ago, Mr. Hoffman has a criminal history score of one (1) and a criminal history category of I for sentencing purposes. *Id*. at ¶¶ 67-68. With a total offense level of twenty-three (23) and a criminal history category of I, the resulting advisory Guidelines range is forty-six (46) months to fifty-seven (57) months. *Id*. at ¶ 114. Probation is allowed for this offense per statute. *Id*. at ¶ 127; *see also* 18 U.S.C. § 3561(c)(1). Due to his financial situation, he does not have the ability to pay a fine in this case, but he has agreed to pay restitution to the Architect of the Capitol in the amount of $2,000. *Id*. at ¶¶ 112, 117.

## IV.     18 U.S.C. § 3553(a) FACTORS

### A.     The Nature and Circumstances of the Offense

Mr. Hoffman's conduct and involvement in the instant offense are beyond regrettable.  In his letter to the Court, he describes his great remorse for his actions on January 6, the way he has turned to and deepened his Christian faith these past three years, and the role model he wishes to be for his children. *See* Exhibit A.  He does not make any excuses and admits to engaging in "awful" and "disgraceful" behavior that was disrespectful to law enforcement and the rule of law. *Id*.  "I do wish I could take back that day…I should have been a peacemaker, I should have hit my knees and prayed." *Id*.  The "chaos and pain and highly charged emotion" of that day caused him to act in a way he had not initially intended, and in a way that is unrecognizable to himself now. *Id*.  He feels ashamed, embarrassed, remorseful, and still loses sleep over what he did, and he

knows amends must be made.  *Id*.  "Nothing I write is to justify my actions and I will not try to…I accept responsibility for what I have done." *Id*.

Since January 6, he has tried to better his life. *Id*.  He has been baptized at church and began a ministry dedicated to spreading the faith and getting resources to those less fortunate. *Id*.  His faith has taught him to center peace and love always. *Id*.  Additionally, he has been engaged in therapy since March of 2024, which has helped him learn how to deal with his emotions in healthy ways. *See* Exhibit JJ.  Mr. Hoffman is the father of eight children, and his "life's joy" is watching them grow into loving human beings. *Id*.  He is dedicated to teaching his children to obey the laws of the country and to respect all law enforcement. *Id*.  "I see how important it is to lead my children in the right direction." *Id*.

### B.  Mr. Hoffman's Personal History and Characteristics

Mr. Hoffman is deeply admired for his love of family, peaceful and engaging nature, and kindness towards others, as evidenced by thirty-four (34) letters of support submitted on his behalf. *See* Exhibits B – II.

Kari Hoffman is Mr. Hoffman's wife. *See* Exhibit B.  She describes Luke as kind and generous and that he has "never known a stranger," always being a positive role model in the community. *Id*.  His generosity of spirit is embodied in how he raised Kari's children from her previous relationship as his own. *Id*.  "These children have thrived with the love and guidance he has given them." *Id*.  She describes his tremendous work ethic, how he provides for the entire family, and how he spends every moment of his free time with the kids. *Id*.  "His life revolves around them, and their lives revolve around him." *Id*.  He teaches the kids about their faith, how

to be thankful, how to pray, and how to help others who are not as fortunate as them. *Id*.  With his business, it is normal for him to receive compliments and good reviews, and several employees depend on him to support their own households. *Id*.  "Never in a million years would I have thought Luke would have done any of the things that happened [on January 6]." *Id*.  After the event, he showed immense remorse for his actions and what he has put his family through. *Id*.  "His smile has faded, and he no longer has the joy in his heart he once had." *Id*.

Sonya VanTuinen and Richard VanTuinen are the mother and stepfather of Mr. Hoffman. *See* Exhibit C.  They describe their son as "thoughtful," "considerate," and a "productive member of society." *Id*.  They have witnessed his close relationship with his children, how he often brings his younger sons on out-of-town work trips with him, "showing them good work ethics at the young age." *Id*.  In addition to his busy home and work life, Mr. Hoffman volunteers at his church and serves meals at a rescue shelter. *Id*.  Even as a child, Mr. Hoffman would "bring kids home to give them a place to feel safe, offer food, and comfort or to stay for a time until their family was doing better." *Id*.  One recent example of his character occurred when he was driving homeward on highway I-25 and came upon a horrible car accident that had occurred moments prior. *Id*.  Mr. Hoffman stopped his car and was one of the first people to get to the severely injured driver who was still in the wrecked vehicle. *Id*.  Mr. Hoffman held the hand of the driver, telling him, "you are not alone," as the driver took his last breaths and passed away. *Id*.  Regarding January 6, his actions on that day do not reflect his true nature, and they have seen Mr. Hoffman punish himself greatly and feel deep remorse for being at the protest. *Id*.

Kami Rigacci is Mr. Hoffman's stepdaughter, although she feels he took her into his life as his own daughter when he joined the family in 2011. *See* Exhibit D. She describes him as "very selfless, honest, loving and helpful." *Id*. Not only has he worked so hard to provide for eight children, he has been there for his grandchildren as well, even paying Kami's rent when her oldest was born. *Id*. "In his role as a stepfather, Luke has been a source of unwavering support and guidance." *Id*. He actively participated in school events, cheered the loudest at graduation, and has created a positive family environment. *Id*. He keeps his children safe, on the right path, and teaches them how to keep their Christian faith in daily life. *Id*. When Kami's biological father went to prison before a father-daughter dance, Mr. Hoffman helped her pick a dress and was there for her when she felt so beneath everybody else. *Id*. He has "simply been there when nobody else was." *Id*.

Pamela Czarnecki is the only sister and oldest sibling of Mr. Hoffman. *See* Exhibit E. Her purpose in writing a letter to the Court was to tell "about how joyful and loving Luke has always been." *Id*. He always has a smile on his face, is ready to give a warm hug or offer a shoulder to cry on or a helping hand, and is willing to listen or offer words of encouragement. *Id*. He is the kind of person that "has and will put himself in harm's way to protect those he loves, a stranger or even an animal." *Id*. He can debate people with opposing political views and at the end of the day lovingly agree to disagree because "relationship is more important than political opinion." *Id*. "He is the type of guy who makes everyone, no matter what your differences, feel seen, heard, safe and loved." *Id*. Mr. Hoffman's actions on January 6 simply do not fit with who her brother is. *Id*. She has seen that he is no longer fully the man full of life he used to be before January 6 – not because

he is angry, but due to the sorrow, sadness, and remorse he holds in his immensely humbled heart. *Id*.

Lilly Vaughn is a niece to Mr. Hoffman, whom she describes as a man "devoted" to his extremely large extended family. *See* Exhibit F.  He is fifteen (15) years older than her, and as a child, she was his sidekick and he would take her on adventures and pay for her to have experiences her parents couldn't afford. *Id*.  He taught her how to be brave, and they even took dance classes together when she was twelve (12) years old. *Id*.  "His words of encouragement always made me confident enough to do things like dance." *Id*.  Mr. Hoffman was always popular at family functions, and the kids would pull him in a thousand directions just to have time with him. *Id*. "You always feel seen, heard, and free to be yourself without judgment when you're hanging out with Luke." *Id*.  When he worked at a pizzeria, some customers would even ask him to sit with them during their meal. *Id*.  He is very inclusive and "would give nothing but encouraging words and made us kids feel like we could do anything." *Id*.  Hearing about the federal charges against him "knocked the wind out of [her], but it taught her an important lesson: Mr. Hoffman is not perfect; he is merely human. *Id*.  "We all make mistakes and sometimes you do something that is completely out of character." *Id*.  Although she is disappointed in Luke's behavior that he displayed on January 6, she knows that is not what defines him as a person.  *Id*.

Twenty-eight (28) other friends and family members wrote letters to this Court attesting to Mr. Hoffman's character, telling numerous anecdotes demonstrating his strong moral character and dedication to his work, family, and faith.  *See* Exhibits G – II.  "Luke is a blessing to us all." *See* Exhibit M.  He "makes us feel special and heard in our lives and passions." *See* Exhibit P.  He is

"the kindest person I've ever come across." *See* Exhibit T.  "By raising his family on a small farm and providing for them with the land, teaching his kids how to care for livestock and grow crops, and helping his children understand the meaning of working towards a future demonstrates his investment in their lives." *See* Exhibit U.  "It is always so refreshing to see Luke." *See* Exhibit W. "It struck me how much he was loved, and needed by his family, and how much his absence would be profoundly felt." *See* Exhibit Z.  "I have spent countless days with him and he has never been unkind to anyone in my presence." *See* Exhibit AA.  "We have family members that are in law enforcement and the military and he has always shown nothing but respect and appreciation for their service." *See* Exhibit CC.

The twenty-eight (28) other letters also shed light on Mr. Hoffman's remorse for his actions on January 6 and just how much of an aberration that event was in his life. *See* Exhibits G – II. "That's not the Luke I know and love." *See* Exhibit L.  This was "so out of character for Luke." *See* Exhibit M.  He has "expressed deep remorse." *See* Exhibit N.  Mr. Hoffman has been heard saying, "I regret going there, I should have never gone, I will never go to any event like that again, I just wanted to see what it was all about." *See* Exhibit O.  "Luke knows the blessing of his wife and kids and it's clear he understands the gravity of his situation…I live and experience his remorse as I interact with him everyday." *See* Exhibit S.  "This is a singular instance which contradicts the overall character of Luke Hoffman as I know him." *See* Exhibit V.  "He just wants to keep his head down and move on." *See* Exhibit DD.  "His remorse for this situation is genuine." *See* Exhibit FF.

In sum, Mr. Hoffman is beloved by his community. All who are close to him believe in his goodness and that he is not defined by his actions on January 6. Furthermore, everyone is confident that he will never again be before the Court, and they cannot wait for his full return to life.

### C.        Mr. Hoffman Poses Little or No Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Hoffman does not fit the archetype of a person who will commit new criminal offenses or recidivate. And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended nor designed to predict recidivism." U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, the Supreme Court in *U.S. v. Booker* has freed the judiciary to remedy this inconsistency. *See* 543 U.S. 220 (2005).

In addition to what has already been described about Mr. Hoffman's character demonstrating his ability to reform, the Commission has also objectively quantified his low

likelihood of recidivism.   For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases.  *See Measuring Recidivism* at 12. With respect to Mr. Hoffman, who is forty (40) years old, defendants thirty-six (36) to forty (40) years old with a criminal history category of I have a recidivism rate of only twelve-point-one percent (12.1%). *Id.* at 28.

Other findings by the Commission support the conclusion that Mr. Hoffman will not commit a criminal offense in the future.  For example, defendants with a criminal history category of I who are legally married, like Mr. Hoffman, have only a nine-point-eight percent (9.8%) recidivism rate. *Id*. at 29.  Additionally, defendants with a criminal history category of I who have obtained some college, like Mr. Hoffman, have only a thirteen-point-nine percent (13.9%) recidivism rate. *Id*.  Also, defendants with a criminal history category of I who were employed during the year prior to an offense, like Mr. Hoffman, have only a twelve-point-seven percent (12.7%) recidivism rate. *Id*.  There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Hoffman would commit any criminal offense in the future.

Beyond the statistics, Mr. Hoffman personally presents no risk of recidivism.  As detailed by his family and friends, Mr. Hoffman has lived his entire life guided by principles completely incongruous with his actions on January 6.  As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Hoffman himself.  Although he has felt crushing remorse for his actions, since his arrest he has kept his focus on taking responsibility for his actions, improving the lives of his family and the community, and living out the principles of his faith.

It is unfortunate that the Guidelines' offense levels do not take into consideration such recidivism data. Such data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Mr. Hoffman is not a person who is statistically likely to recidivate. And, when one considers such statistics in light of Mr. Hoffman's personal history and characteristics, it is safe to assume that he will never again be arrested or charged with an offense.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This factor has become especially important in January 6 cases. This District is well versed in the now one-hundred-and-eleven (111) page sentencing comparison chart of all January 6 defendants.[1] For sake of brevity and to focus the Court's attention, Mr. Hoffman asks the Court to consider cases in which this Court and this District already imposed sentences. Each contains important facts that distinguish Mr. Hoffman's conduct and support a sentence of probation with home detention.

In *United States v. Adam Jackson*, a case that was before Judge Contreras, Mr. Jackson pled guilty to violating 18 U.S.C. § 111(a)(1). *See* 1:22-CR-00230-RC. The government asked for 41 months' incarceration, 36 months' supervised release, and $2,000 restitution. *Id*. The Court sentenced Mr. Jackson to 36 months' probation with special conditions including 52 consecutive weekends of intermittent incarceration coinciding with one year of home confinement, a $4,392

---

[1] Available at https://www.justice.gov/usao-dc/capitol-breach-cases.

fine, and $2,000 restitution. *Id*.  Mr. Jackson's conduct was more serious than Mr. Hoffman's conduct.  Upon first arriving to the Capitol, Mr. Jackson encouraged rioters to enter the Capitol, climbed on top of a ladder, and videotaped the violence perpetrated onto police officers while saying things such as, "fuck you, we won't do what you tell us! Yes! Fight! Let us in! Push! This is our house!" *Id*. at ECF 61.  Then, as he was in a crowd of rioters, he assaulted law enforcement officers by hurling a large cone-like object at them and by charging at and ramming them with a police riot shield. *Id*.  Days later, he posted on Facebook, finding it humorous that he took a riot shield, alleged the United States was engaged in a coverup, and stated his plans to show up for the Inauguration. *Id*.

In *United States v. Matthew Council*, a case that was before Judge McFadden, Mr. Council pled guilty to violating 18 U.S.C. § 111(a)(1), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). *See* 1:21-CR-00207-TNM.  The government asked for 30 months' incarceration, 36 months' supervised release, and $2,000 restitution. *Id*.  The court sentenced Mr. Council to 60 months' probation, 6 months' home detention, 100 hours community service, and $2,000 restitution. *Id*.  Mr. Council's conduct was more serious than Mr. Hoffman's conduct.  Mr. Council verbally assaulted police officers and entered the Capitol through a door that had been broken into by rioters. *Id*. at ECF 55.  Inside the Capitol, he barged into police officers with his hands out and head down, attempting to push them back and make a hole so that other rioters could go through. *Id*.  He later discussed his actions on a podcast and said he was "fighting the good fight." *Id*.

15

In *United States v. Grayson Sherrill*, a case that was before Judge Chutkan, Mr. Sherrill pled guilty to violating 18 U.S.C. § 111(a)(1) and (b). *See* 1:21-CR-00282-TSC. The government asked for 41 months' incarceration, 36 months' supervised release, and $2,000 restitution. *Id*. The court sentenced Mr. Sherrill to 7 months' incarceration, 12 months' supervised release, and $2,000 restitution. *Id*. Mr. Sherrill's conduct was more serious and premeditated than Mr. Hoffman's conduct. Before attending the "Stop the Steal" rally, Mr. Sherrill purchased a Faraday bag in an attempt to prevent the government from tracking his location. *Id*. at ECF 104. While participating in the riots outside of the Capitol, he picked up a metal pole that had been broken off from a metal bicycle barricade. *Id*. He then used that metal pole to violently confront police officers, swinging the pole at a police officer who then had to catch his footing and re-adjust his police equipment. *Id*. While still carrying the metal pole, Mr. Sherrill then entered the Capitol, walked throughout the building, climbed statues in the Rotunda, and took pictures of himself. *Id*.

In no way minimizing Mr. Hoffman's conduct, it is important to note that his actions that day are not of the most extreme nature when placed on the spectrum of January 6 defendants. The facts and context of this case and his life suggest that he was caught up in a regrettable and emotional moment he had not planned for, and the evidence does not support the contention that he went to the Capitol that day for the purpose of violence and destruction or committing any crime. The fact that he brought his pregnant wife with him on the trip to Washington D.C. is evidence that he did not intend on being involved in any criminal, let alone riotous, activity.

16

### E.  Mr. Hoffman's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  There is no need for personal deterrence in this case, as Mr. Hoffman has endured severe regret and shame in experiencing his loved ones and the community's reaction to his conduct on January 6.  No one can punish Mr. Hoffman as much as he has punished himself, as he has come to grips with the reality that he risked everything he loves and holds near to his heart that day.  Mr. Hoffman, a devoted husband, loving father, and business owner who has always centered and structured his life around his family and faith, witnessed his life's worst and least Christ-like actions be publicized nationwide.  Furthermore, Mr. Hoffman is not the type of person who would commit any further crimes in the future, as the recidivism statistics demonstrate.

Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Hoffman's offense simply by charging and convicting him.  As a result, numerous media outlets will discuss Mr. Hoffman and the substance of his offense, as they have done in the past.  Further, Mr. Hoffman will be discussed in various conversations and settings among family and friends for years to come, a shameful reality from which he simply cannot escape.  In short, Mr. Hoffman's public demise sends a strong message to anyone who might attempt such conduct in the future.

### V.    CONCLUSION

Considering the above, Mr. Hoffman respectfully requests that the Court impose a term of probation with home detention.

17

Respectfully submitted,

_____/s/_____
Paulette M. Pagán
D.C. Bar No. 137374
David Benowitz
D.C. Bar No. 451557
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
Tel: (202) 731-9882
Fax: (202) 664-1331
David@PriceBenowitz.com
Paulette@PriceBenowitz.com

*Counsel for Luke Hoffman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 6th day of September 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.

_____/s/_____
Paulette M. Pagán